# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| KIM M. PULEO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 09 C 5262 |
| v. | ) |
| | ) Magistrate Judge |
| MICHAEL J. ASTRUE, | ) Martin Ashman |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kim M. Puleo ("Puleo") seeks judicial review of a final decision of Defendant Michael J. Astrue, Commissioner of Social Security ("Commissioner"), denying her claim for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-431. Before this Court are Puleo's Motion for Summary Judgment and the Commissioner's Cross Motion for Summary Judgment. The parties have consented to have this Court conduct all proceedings in this case, including the entry of final judgment pursuant to 28 U.S.C. § 636(c) and N.D. Ill. R. 73.1(c). For the reasons set forth below, this Court affirms the Commissioner's decision.

### I. Procedural History

On August 29, 2006, Puleo filed an application for DIB claiming that she became disabled on March 20, 2005 due to ongoing treatment for a left elbow injury and Crohn's

disease.[1] (R. at 97, 133.) The Social Security Administration ("SSA") denied Puleo's application initially on December 19, 2006, and upon reconsideration, on May 23, 2007. (R. at 59, 66.) Puleo then submitted a timely request on July 23, 2007 for a hearing before an administrative law judge ("ALJ"). (R. at 72.) The administrative hearing was held on March 20, 2008 before ALJ Maren Dougherty, who issued a decision on April 16, 2008 finding that Puleo was not disabled. (R. at 58.) The SSA Appeals Council denied Puleo's request for review of the ALJ's decision, and the ALJ's decision became the final decision of the Commissioner. (R. at 1.) Plaintiff now appeals from that decision.

## II. Factual Background

### A. Medical History

Ms. Puleo was born on July 6, 1966, and is married with two children. (R. at 158, 166.) After completing high school, she has worked for the last fifteen years primarily in clerical positions such as an office clerk, customer service representative, or order entry clerk. (R. at 44, 112-15.) Unfortunately, Puleo suffered a serious fall at work in March 2004 and severely fractured her left elbow. On March 19, 2004, Dr. Thomas Karnezis performed the first of several surgeries on Puleo's elbow, this time to repair the fracture by an open reduction and internal fixation, and Puleo entered a program of physical therapy. (R. at 250-55, 296-302.) While in therapy, however, Puleo began experiencing pain in her left elbow, and an examination

---

[1] Plaintiff raised the Crohn's issue during her administrative hearing but does not do so here. Puleo was diagnosed with Crohn's disease in February 1999. (R. at 189.) Her Crohn's disease is now relatively well controlled, except for the occasional flare-up, and she does not regularly take any medication to control the disease. (R. at 271, 335.)

noted a metallic pin projecting medially from the joint. (R. at 235, 250-55, 296-305.) Accordingly, Puleo underwent another surgery on September 17, 2004 to remove the painful hardware and bone spurs around her left elbow. (R. at 278.) In the operative report, Dr. Karnezis noted that despite the pain Puleo was experiencing, the bone was well-healed and in full union. (R. at 279.)

Several problems arose after Puleo's first follow-up surgery, and she was required to undergo yet another surgical procedure on June 24, 2005 to remove painful plates and screws in her left elbow, to clean out fragments around the joint area, and to perform a bone graft. (R. at 310.) Puleo tolerated the new surgery well but had to be readmitted six days later when the bond holding her surgical wound separated. (R. at 315.) In the physical therapy that followed, Puleo reported pain of about a three on a ten point scale, with ten being the most painful. (R. at 213-17.) She also continued to experience a limited range of movement and difficulty lifting heavy objects with her left arm. (R. at 215.)

Puleo endured another setback in January 2006 when she reinjured her elbow while going through a revolving door. (R. at 238.) A CT scan on January 19, 2006 found a chronic humeral fracture as well as some angulation in the healing of the medial portion of the fractured fragments. (R. at 233.) Dr. Karnezis also noted severe degenerative changes involving the left-elbow joint space. (*Id.*) Accordingly, Puleo underwent another operation on June 24, 2006 to repair and stabilize the new fracture. (R. at 238.) In his operative report, Dr. Karnezis stated that the original 2004 injury had healed both laterally and medially prior to the re-injury, and x–rays taken after the surgical procedure revealed that the new fracture appeared to be well-aligned. (R. at 243, 333.)

From June to August of 2006, Dr. Karnezis recommended that Puleo not attend work and that she concentrate on slowly increasing her range of motion. (R. at 329-31.) Dr. Karnezis allowed her to return to work on September 11, 2006, but Puleo was cautioned not to use her left arm. (R. at 327.) After gradually increasing the use of her left arm, Dr. Karnezis cleared Puleo to return to full duty at work in November 2006, noting that her left elbow post-malunion appeared to be healing nicely. (R. at 325-27.)

Puleo, however, continued to report pain and physical limitations in using her left elbow. On November 16, 2006, Dr. Ahmari M. Shaikh conducted a consultative examination for the Bureau of Disability Determination Services, and Puleo reported constant pain of a seven on a ten point scale, with ten being the most painful. (R. at 334.) Dr. Shaikh also noted considerable deformity in Puleo's left elbow, reported a grip strength of four out of five, and found that Puleo had abnormal functioning with her left hand. (R. at 335-36.)

In April 2007, Dr. Karnezis opined that Puleo was at maximum medical improvement and could function and perform her activities overall. (R. at 400.) He did note, however, that the elbow continued to cause her pain on an intermittent basis, sometimes reaching an eight on a ten point scale. (*Id.*) Dr. Karnezis' again noted that Puleo could return to full-time work, now with only a twenty pound weight restriction and limited extension when using her left arm. (R. at 401.) A consulting physician for Puleo's insurance company, Dr. Gregory Nicholson, also conducted an examination on May 15, 2007. Contrary to Dr. Karnezis' conclusion, Dr. Nicholson found that Puleo had not reached maximum improvement, (Plt's. Mot., Ex. 1), and determined that she suffered significant loss of function due to post-traumatic arthrosis and soft-tissue contracture. (R. at 405) As a result, Dr. Nicholson recommended further advanced

surgery to restore Puleo's range of motion and recommended that she be restricted to desk work and use of a keyboard, although Puleo felt that even this work would be too painful. (Plt's. Mot., Ex. 1.)

By July 2007, Dr. Karnezis believed that Puleo could now work without any restrictions. (R. at 402.) He reported that she was no longer experiencing pain or discomfort, although she still had a limited range of motion. (*Id*.) Dr. Karnezis presented Puleo with some options for further surgery, such as a partial or total elbow replacement should she desire to regain the full range of motion of her left elbow, but he did not recommend undergoing further surgical procedures since she appeared functional and was not complaining of pain. (R. at 403.)

### B. Puleo's Testimony at the Administrative Hearing

On March 20, 2008, Puleo appeared at an administrative hearing before the ALJ to testify about her employment history, alleged disability, and the symptoms affecting her ability to work. She claimed that she had to leave her previous employment because of pain in her left arm. (R. at 17.) Puleo testified that she is left-hand dominant and described constant pain in her left elbow that radiates to her hand when writing or typing. (R. at 17, 20.) According to her testimony, pain can also result from prolonged, repetitive use of her left arm while using a keyboard, writing, reaching, and lifting. (R. at 17-18.) Puleo physically demonstrated for the ALJ the limited flexion and extension of her left elbow, which the ALJ noted for the record was consistent with the medical reports about her range of motion. (R. at 18-19.)

Puleo testified that the last time she took prescription pain medication was in February 2007. (R. at. 21) For pain relief, Puleo relies on heating pads and almost daily use

Advil or Ibuprofen (typically 1500 mg). (R. at 21, 30.) She dislikes taking anti-inflammatories, however, because she claims they can aggravate her Crohn's disease. (*Id.*; R. at 232.) With regard to her daily activities, Puleo stated that she is primarily in charge of the household chores, but requires assistance with activities like mopping the floors or folding large laundry. (R. at 19, 22, 29.) She conducts the majority of the grocery shopping, but requires help carrying heavy groceries into the house. (R. at 20.) Puleo also testified that since her injury, she no longer engages in any substantial activity outside of her household chores. (R. at 31-32.)

### C. The ALJ's RFC Assessment

The ALJ concluded that Puleo has the residual functional capacity ("RFC") to perform sedentary work except that she "cannot perform more than frequent handling and grasping or perform any extended reaching with her left (dominant) arm." (R. at 54-55.) The ALJ determined that Puleo's medical history could reasonably be expected to produce the pain and symptoms she alleged in her testimony but that, notwithstanding, her statements regarding the intensity, persistence, and limiting effects of the pain and symptoms in her left arm were not entirely credible. (R. at 55.) The ALJ also concluded that Puleo's testimony that she has very little use of her left hand goes against medical evidence demonstrating that her hand use was intact once she healed from her injuries. (R. at 55.) In addition, the ALJ noted that no further surgery was seriously contemplated by Puleo's surgeon. (R. at 57.)

According to the ALJ, Puleo's credibility was undercut because of her "failure to take more than mild analgesics periodically" and her ability to sign forms and to gesticulate during her social security interviews. (*Id.*) The ALJ also relied on medical evidence in the record to

determine Puleo's physical limitations, noting that Puleo's treating physician only placed weight restrictions on her left hand, and never cautioned her in terms of grasping or handling. (*Id.*)

In addition, the ALJ looked to the findings of the state agency medical examiners, Dr. Francis Vincent and Dr. Calixto Aquino, in making his RFC assessment. Dr. Vincent found that Puleo is limited to "occasionally" lifting twenty pounds; "frequently" lifting ten pounds; and is limited in the upper extremities for pushing and pulling.[2] (R. at 343.) He also found Puleo's left arm limited in reaching in all directions, handling, and fingering. (R. at 345.) Dr. Aquino confirmed this assessment, adding that Puleo is limited to frequent handling and fingering in the left hand. (R. at 372.) Based on these opinions, the ALJ determined that it was appropriate to limit Puleo to frequent use of her left hand and limited the RFC to sedentary work. (R. at 57.)

### D. The ALJ's Findings

In an opinion dated April 16, 2008, the ALJ concluded that Puleo is not disabled. (R. at 54-58.) In so finding, the ALJ applied the familiar five-step evaluation process for determining disability, which requires her to analyze:

> (1) whether the claimant is currently [un]employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner], see 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.

*Clifford v. Apfel*, 227 F.3d 863, 868 (7th. Cir. 2000) (quoting *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995)). If at step three the ALJ finds that the claimant's medical impairments do not

---

[2] "Occasional" is defined as up to one-third of the day, and "frequent" is defined as one-third to two-thirds of the day. SSR 83-10.

meet the requirements of a listed impairment in the regulations, the ALJ must assess the claimant's residual functional capacity based on all the relevant evidence. 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC at steps four and five to determine whether the claimant can perform past work or other work available in the national economy. *Id*. § 404.1520 (f), (g).

Here, the ALJ found at step one that Puleo has not engaged in substantial gainful activity since March 20, 2005. (R. at 54.) At step two, the ALJ determined that Puleo has a severe impairment of a "status post left elbow fracture." (*Id*.) At step three, the ALJ found that Puleo does not have an impairment that meets or medically equals one of the listed impairments in the regulations. (*Id*.) For step four, the ALJ determined that Puleo has the RFC to perform sedentary work as defined by the regulations, except that "she cannot perform more than frequent handling or grasping or perform any extended reaching with her left (dominant) arm." (R. at 54-58.) The ALJ further concluded that Puleo is capable of performing her past relevant work as a customer service representative and thus is not disabled. (R. at 58.)

### III. Standard of Review

Judicial review of the ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court reviews the entire record, but does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v.*

*Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). Thus, even if reasonable minds could differ whether the Plaintiff is disabled, courts will affirm a decision if the ALJ's decision has adequate support. *Elder*, 529 F.3d at 413 (citing *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007)).

## IV. Discussion

Puleo objects to the ALJ's decision on two grounds. According to Puleo, the ALJ erred at step three in finding that her left elbow impairments did not meet the criteria of Listing 1.07 in the Listing of Impairments, and then erred at step four by reaching an RFC assessment that is inconsistent with the medical record. In support of the latter claim, Puleo contends that the ALJ erred in finding that her statements concerning her condition were not entirely credible.

### A. Listed Impairment

A claimant is disabled at step three if she has an impairment that meets or equals a condition found in the Listing of Impairments. 20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Listing describes impairments considered presumptively disabling when the claimant's medical impairments meet all the criteria in a specific listing. *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999); *see* 20 C.F.R. §§ 404.1525(a), 416.925(a). In order to meet or equal a listed impairment, Puleo bears the burden of proving that her condition satisfies all of the criteria of the specific Listing requirement. *Maggard*, 167 F.3d at 379.

Listing 1.07 describes the following condition:

> Fracture of an upper extremity with nonunion of a fracture of the shaft of the humerus, radius, or ulna, under continuing surgical management, as defined in 1.00M, directed toward restoration of functional use of the extremity, and such function was not restored or expected to be restored within 12 months of onset.

20 C.F.R. Pt. 404, Subpt. P, App. 1. The ALJ found that Puleo did not meet this standard, in relevant part, because she failed to show "that the severity of her condition meets the standards set forth at section 1.07, [and] twelve months of total loss of the use of the left upper extremity is not demonstrated." (R. at 54.) Apparently interpreting Listing 1.07 as requiring a fracture that persists for twelve months or more, Puleo relies on a claim that her original 2004 elbow fracture did not heal until 2007 to argue that the ALJ's conclusion is flawed. In addition, she claims that the ALJ erred by using an incorrect legal standard in applying Listing 1.07's requirements to her case.

The record in this case does not support Puleo's first argument concerning the duration of her fractured elbow. As noted above, Puleo underwent surgery on March 19, 2004 to repair the first fracture, but was unfortunately required to undergo two additional follow-up surgeries to repair various problems in her elbow. One of those operations took place on September 17, 2004, and was performed by Puleo's initial surgeon, Dr. Karnezis. Contrary to Puleo's argument, however, Dr. Karnezis' September 17 surgery notes state that there was no evidence of a fracture at that time and that "[t]he bone had healed remarkably well in full union[.]" (R. at 279.) As Listing 1.07 requires a claimant to have both a fracture and a nonunion of the fracture in order to be considered disabled at step three, Dr. Karnezis' evaluation of Puleo's elbow is substantial evidence that Puleo's claim of an on-going fracture is incorrect.

It is undisputed that Puleo suffered a second fracture in January 2006, which also required surgical repair by Dr. Karnezis . Before having that surgery on May 25, 2006, Dr. Guido Marra reviewed Puleo's records on February 16, 2006, including a CT scan showing the recent fracture, and he issued a report. (R. at 398-99.) Puleo relies on the fact that Dr. Marra noted "a lateral column nonunion" in his report to argue that she was continuously injured from 2004 through 2007. However, this claim overlooks the fact that Dr. Marra was examining records that included Puleo's recent 2006 fracture, and his report does not support an argument that the initial fracture had not healed prior to the second accident that occurred in January, 2006.

Other evidence in the record, moreover, demonstrates that, like her first fracture, Puleo's second injury also healed by 2007. For example, Dr. Karnezis noted on October 6, 2006 that Puleo's second fracture was "healing nicely," and he stated on January 10, 2007 that the fracture line had calcified and mineralized. (R. at 325, 350.) By April 11, 2007, Dr. Karnezis concluded that x-rays showed that Puleo's second elbow fracture had healed altogether, as had the "left elbow nonunion." (R. at 400.)

Puleo cites a report by orthopedic surgeon Dr. Gregory Nicholson dated May 15, 2007 to support her claim that her elbow never healed, but reliance on that report is misplaced. Based on x-rays he took, Dr. Nicholson did not conclude that Puleo continued to suffer from a fracture or non-union. Speaking in the past tense, Dr. Nicholson merely stated that diagnostic tests showed "that there *was* a persistent non-union line" in her bone. (R. at 405) (emphasis added.) As all of his other conclusions are stated in the present tense, Dr. Nicholson's notes must be understood to state that tests indicated that Puleo had previously had a fracture, not that she had one on

May 15, 2007.  In the absence of any argument on why Dr. Nicholson's comments could be construed otherwise, or why they contradict the conclusion of Puleo's treating physician that her second fracture had healed, the Court finds that the medical record contradicts Puleo's claim that she suffered from a persistent nonunion of her left elbow from 2004 through 2007.

Puleo's second argument concerning the legal standard applied by the ALJ to her case fares somewhat better.  The ALJ found that Puleo did not meet Listing 1.07, in part, because "twelve months of total loss of the use of the left upper extremity is not demonstrated."  (R. at 54.)  On its face, Listing 1.07 does not require a claimant to suffer such a loss.  Instead, it addresses an upper extremity's "functional use," the loss of which is carefully defined in the regulations as the "inability to perform fine and gross movement effectively on a sustained basis."  20 C.F.R. Pt. 404, Subpt. P, App. 1, 1.00B.  The inability to perform such movements is further characterized by "an extreme loss of function of both upper extremities; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initial, sustain, or complete activities."  20 C.F.R. Pt. 404, Subpt. P, App., 1, 1.00(B)(2)(c).  As Puleo states, the ALJ's conclusion that Listing 1.07 requires a "total loss" of functioning is not entirely consistent with these supporting definitions.

Nevertheless, the ALJ did not base his decision at step three on this ground alone.  She also reached stated that "[t]he criteria set forth at section 1.02(B) are not satisfied as the claimant does not have *bilateral* issues."  (R. at 54) (emphasis added).  Although neither Puleo nor the Commissioner has cited the applicable regulation, the ALJ appears to have referred to 1.00(B)(2)(c) in Appendix 1, which requires a claimant to have the loss "of both upper extremities" before she can meet Listing 1.07's requirement for "functional loss."  Puleo,

however, does not argue that she suffered the kind of bilateral difficulties required by the regulations. Indeed, Puleo's treating physician stated on April 11, 2007 that she could return to work with the full use of her right upper extremity, (R. at 401), thereby confirming the ALJ's finding at step three that she did not suffer impairments in both of her upper limbs.

Accordingly, even if the ALJ incorrectly assumed that Puleo was required to show a "total loss" of functioning, the ALJ would still have been able to conclude that she did not meet Listing 1.07 because Puleo did not meet either the bilateral requirement of 1.00(B)(2)(c) or the fracture/nonunion requirement, discussed above, at the time of the hearing. As such, any oversight the ALJ may have committed by requiring Puleo to demonstrate a "total loss" of functioning constitutes only harmless error and does not provide grounds for remand.[3] *See Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003) (finding that the harmless error rule "is fully applicable to judicial review of administrative decisions[.]").

### B. The RFC Assessment

At step four, the ALJ must determine whether a claimant's RFC enables her to perform past relevant work. The RFC measures the claimant's abilities despite her impairments and is based upon all of the relevant evidence, including objective medical evidence, physicians'

---

[3] In her reply brief, Puleo contends that the ALJ also failed to build a logical bridge between the record and his conclusion at step three. An ALJ must "rationally articulate the grounds for her decision, building an accurate and logical bridge between the evidence and her conclusion because we confine our review to the reasons supplied by the ALJ." *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) (citation omitted). As Puleo did not raise this issue in her motion and asserts it for the first time in the reply, the Court does not consider it as part of Puleo's challenge to the ALJ's opinion. *See Graff v. City of Chicago*, 9 F.3d 1309, 1318 n.6 (7th Cir. 1993) (stating that arguments raised for the first time in a reply are waived).

opinions and observations, and the claimant's own descriptions of her limitations. 20 C.F.R. § 404.1545(a). As the ALJ concluded that Puleo's statements about the intensity, persistence, and limiting effects of her symptoms should not be given full credence in making the RFC assessment, the Court begins by first addressing the ALJ's credibility determination. (R. at 55.)

1. Credibility Determination

The Court reviews an ALJ's credibility decision with deference because the ALJ is in the best position to evaluate this issue. *Craft*, 539 F.3d at 678. An ALJ's credibility determination warrants reversal only if it is so lacking in explanation or support that it is "patently wrong." *Elder*, 529 F.3d at 413-14. An ALJ should consider the entire case record and give specific reasons for the weight given to an individual's statements. SSR 96-7p. Factors that should be considered include the objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, types of treatment received, medication taken, and functional limitations. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

Puleo first argues that the ALJ incorrectly assessed her intake of pain medication. The ALJ, however, correctly noted that Puleo was no longer taking prescription pain medication. Puleo stated that the last time she had taken such medication was in February 2007, over a year before the March 2008 hearing, and that she takes over-the-counter drugs only once, or on rare occasions, twice daily. (R. at 21, 30.) Puleo points out that she testified at the hearing that she avoids taking anti-inflammatories like Aleve and Ibprofen because they can affect her Crohn's disease – a concern supported by a medical report from her gastroenterologist. (R. at 30, 232.) Nevertheless, her gastroenterologist also presented Puleo with the alternative of taking Tylenol

to relieve pain. (*Id.*) Puleo does not argue that Tylenol is ineffective for her pain, nor does she contend that she is not able to take prescription pain medicine because of her Crohn's disease. Based on this testimony, the ALJ was entitled to conclude that Puleo' ingestion of over-the-counter medication was mild and not frequent enough to substantiate her allegations of severe pain. *See Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (in making credibility determinations, the ALJ should consider dosage, effectiveness and side effects of medication).

Puleo also takes issue with the fact that the ALJ determined that her alleged difficulties in using her left hand were at odds with observations by SSA employees that she had signed twelve documents in an earlier interview and that she was seen "gesticulating" with her left arm. (Plt's. Mot. at 5.) Observation can play some role in an ALJ's determinations, although the Seventh Circuit has expressed concerns about the reliability of such evidence. *See Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) ("We doubt the probative value of any evidence that can be so easily manipulated as watching whether someone *acts* like they are in discomfort."). That is especially true when, as here, the ALJ relied on second-hand observations of persons who were apparently not present at the hearing. Nevertheless, the ALJ's remarks on this issue constitute only a small part of her credibility analysis, and the opinion does not suggest that the observations noted by the ALJ were in any way determinative in reaching her conclusion. Thus, the Court does not find that the two sentences in the opinion that describe these observations are, in themselves, sufficient grounds to remand on the credibility issue.

As part of her credibility finding, the ALJ concluded that Puleo's testimony at the hearing concerning her pain was not supported by statements she made to her treating physician, Dr. Karnezis. The ALJ considered, for example, Dr. Karnezis' assessment of weight restrictions

that were appropriate for Puleo in 2006 and 2007, his ongoing evaluations of her improving medical condition, and as noted, her pain levels. (R. at 57-58.) The ALJ noted that Puleo denied ever telling Dr. Karnezis that she was free of pain even though the treating physician's notes for July 18, 2007 indicate that she was "doing well without any pain." (Tr. 57, 402.) Puleo contends that she complained of pain to the consulting physicians she saw, but she does not cite any portion of the record to support this claim. The Court notes that Dr. Karnezis' July 18 report stating that Puleo no longer suffered from pain appears to post-date any pain-related complaints she may have made to consulting physicians in this case.

As a result, Puleo has not shown that the ALJ's credibility determination is "patently wrong," *Elder*, 529 F.3d at 413-14, and the Court finds that substantial evidence supports the ALJ's finding.

### 2. The RFC Determination

The ALJ determined that Puleo has the ability to perform sedentary work. (R. at 55.) Under the regulations, sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. 20 C.F.R. § 404.1567. Puleo does not challenge the ALJ's sedentary finding, alleging instead that the ALJ erred in concluding that she can perform "frequent" handling and grasping. Puleo argues that, contrary to the ALJ's finding, she can perform only "occasional" reaching. (Plt's. Mot. at 5.) The term "occasional" is defined as up to one-third of the workday, and "frequent" means one-third to two-thirds of the workday. SSR 83-10.

In her motion, Puleo claims that the ALJ's assessment is not supported by the record and that the ALJ's review of the available evidence was selective. (Plt's. Mot. at 5.) In support of this argument, Puleo points to the fact that the VE testified that if Puleo were limited to an ability to reach only "occasionally," her job opportunities would be eroded. (R. at 42.) The significance of this argument is not entirely clear. The VE did not testify that Puleo was, in fact, limited to only occasional handling, nor does a VE determine a claimant's RFC. Instead, the VE was here responding to a hypothetical posed by the ALJ that included Puleo's limitations. (R. at 38.) *See O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) (stating that the law requires "the ALJ to orient the VE to the totality of a claimant's limitations."). Thus, the VE's response to the ALJ's question is not grounds for arguing that the RFC assessment is not supported by the medical record.

Puleo also argues that the ALJ failed to take appropriate note of statements she made during the hearing on difficulties she experiences in carrying out daily tasks. An ALJ is required to consider a claimant's testimony on such issues, *Prochaska*, 454 F.3d at 738, and the ALJ did so here. (R. at 55.) However, the ALJ is "not obliged to believe all [of a claimant's] testimony" and "is free to discount the applicant's testimony on the basis of the other evidence in the case." *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006). As noted above, Puleo has not shown that the ALJ's credibility finding is erroneous

Moreover, the RFC determination in this case is supported by the assessment conducted by Dr. Vincent and confirmed by Dr. Aquino. (R. at 343, 370). Dr. Vincent determined that Puleo could "occasionally" lift twenty pounds and "frequently" lift ten pounds. (R. at 343.) He also found her limited in her ability to push, pull, reach, finger and handle. (R. at 345.)

Dr. Vincent noted that Puleo was only limited in the left hand, but did not specify the extent of her limitations. (*Id.*; R. at 57.) Upon reexamination, Dr. Aquino found that Puleo's lack of extension in her left arm limited her from reaching in all directions. (R. at 372.) He also stated she was limited to "frequent handling and fingering with the left hand." (*Id.*) Puleo has not shown that such evidence contradicts that of her treating physician, who found her capable of returning to full work duty with only a twenty pound weight restriction on her left arm and no significant restrictions on her ability to reach, handle, or grasp. (R. at 350-52.) Nor, in her motion, does Puleo direct the Court's attention to any specific evidence in the record that supports her claim that the ALJ's RFC assessment is incorrect.

Instead, Puleo states in her reply brief that consulting physician Dr. Scott Kale noted that she had "marked atrophy of the left biceps and forearm." (R. at 365.) Although not entirely clear, Puleo appears to be arguing that the lack of strength in her left arm prevents her from performing the "frequent" reaching included in the RFC assessment. The ALJ, however, made clear at the hearing that his finding was based on the use of both of Puleo's arms, not just her left arm. (R. at 43) ("And let's be clear, because we're talking about bilaterally. This is the use [sic] the hand bilaterally."). Indeed, the ALJ clarified with the VE that "[t]he fact that you have an unlimited non-dominant hand doesn't change the analysis." (*Id.*) Thus, even though Puleo claims that pain, fatigue, and a limited range of movement prevent frequent use of her left arm, this did not preclude the ALJ from finding that Puleo can frequently reach and handle *bilaterally*, thus meeting the DOT requirements for her previous position as a customer service representative.

As a result, Puleo has not shown how the ALJ's RFC assessment is erroneous, and the Court finds that substantial evidence supports the ALJ's finding that Puleo is limited to frequent handling and grasping.

## V. Conclusion

For the aforementioned reasons, the Court affirms the Commissioner's final decision, denies Puleo's Motion for Summary Judgment, and grants the Commissioner's Cross Motion for Summary Judgment.

**ENTER ORDER:**

_____
**MARTIN C. ASHMAN**
**Dated:** March 4, 2011. United States Magistrate Judge